# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

MARY C. COX,                          )
                                      )
                                      )
            Plaintiff,                )
                                      )
v.                                    )        No.  04-CV-768-SAJ
                                      )
JO ANNE B. BARNHART,                  )
Commissioner of Social Security       )
Administration,                       )
                                      )
            Defendant.                )

## OPINION AND ORDER[1/]

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Commissioner denying Social Security benefits.[2/]  Plaintiff asserts that the Commissioner erred because (1) the ALJ did not properly evaluate Plaintiff's mental impairments; and (2) the ALJ did not appropriately consider the testimony of the vocational expert.  For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born December 25, 1948.  [R. at 46].  In her disability report, Plaintiff wrote that she had fibromyalgia syndrome, leg cramps, fatigue, headaches, mental disorientation, and weak spells.  [R. at 68].  Plaintiff indicated that she stopped working on

---

[1/]    This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

[2/]    Administrative Law Judge Lantz McClain (hereafter "ALJ") concluded that Plaintiff was not disabled by decision dated December 18, 2003.  [R. at 10 - 21].  Plaintiff appealed the decision by the ALJ to the Appeals Council.  The Appeals Council declined Plaintiff's request for review on August 5, 2004.  [R. at 5].

April 1, 1998 when her doctor told her not to work due to the pain in her right wrist.  [R. at 68].

In a Disability Supplemental Interview Outline, Plaintiff described her average day. She noted that she and her husband helped each other do chores, clean, and wash dishes. [R. at 86].  Plaintiff wrote that she experienced pain and was not capable of performing jobs that she previously did.  [R. at 86].  According to Plaintiff, she slept between three and five hours each night.  [R. at 86].  Plaintiff noted that she could not curl her hair because it hurt her arms and neck.  [R. at 87].  Plaintiff is able to prepare some meals, but noted that her hand sometimes became numb.  [R. at 87].  Plaintiff indicated that she was unable to take wet clothes out of her washing machine.  [R. at 88].  Plaintiff noted that she read the Bible or garden books for approximately one hour each day, and listened to news or movies about three to four hours each day.  [R. at 89].  Plaintiff also wrote that she suffered from anxiety and had difficulty concentrating.  [R. at 94].

Plaintiff completed a pain questionnaire on April 9, 2002.  [R. at 96].  Plaintiff wrote that she took a short walk once each day, that she washed dishes, that she cleaned and did light cooking, and that she put dry clothes into the washing machine.  [R. at 96]. According to Plaintiff, she is unable to take wet clothes out of the washing machine due to pain in her arms and hands.  [R. at 96].  Plaintiff described her pain as being located in her neck, shoulders, elbow, arms, hands, and head.  [R. at 96].

Plaintiff completed a medications list noting that she took Zoloft, Risperdal, Mirtazapine, Clonazepam, Metrolol, Enalapril, Furosemide, Pot-choride, and Ranitipine. [R. at 109].

Plaintiff was employed by Braums for 11 months when she filed a workers' compensation claim for a repetitive trauma injury to her wrist.  [R. at 59].  A net payment was made to Plaintiff on January 16, 1997 in the amount of $1,416.18.  [R. at 60].

During an interview with a social security investigator on November 8, 2001, Plaintiff was described as fidgety, exhibiting some confusion and inappropriately answering questions, apologizing frequently, and wearing a wrist brace which she shook when signing forms.  [R. at 65].

Plaintiff's record lists numerous visits to a community clinic.  On September 7, 2000, Plaintiff complained of severe pain in her trapezious with no numbness.  The doctor note that all muscle groups tested normal.  The record also contains the note "fibromyalgia." [R. at 120].

X-rays from February 18, 2000, indicated severe degenerative changes and spur formation which impinged on the "posterior aspect of the hypopharynx and cervical esophagus. . . . "  [R. at 132].

Jan Snider Kent, Ph.D., completed a psychological evaluation of Plaintiff on January 4, 2002.  [R. at 147].  She noted that Plaintiff was raped while she was in the first grade by an unknown individual.  Plaintiff left home at the age of eighteen to marry.  [R. at 147]. Plaintiff completed ninth grade.  Plaintiff was retained in the first grade after missing a lot of school due to the rape.  [R. at 147].  Plaintiff reportedly left school before graduating because her mother had cancer.  [R. at 147].  Plaintiff reported being married six times. [R. at 148].  Plaintiff indicated that she was diagnosed with fibromyalgia two or three years prior to her examination and had experienced difficulty with her right hand since 1996.  [R. at 148].  Plaintiff reported having attempted suicide three or four years previously when she

-- 3 --

began remembering details of the rape.  [R. at 148].  Plaintiff had never been treated as an inpatient, but had received outpatient treatment for three months prior to her examination.  [R. at 148].  Plaintiff reported depression stemming from a death of a friend (five years ago), a brother (eight years ago) and her father (several years ago).  [R. at 149].  The examiner noted that Plaintiff appeared to be experiencing some post-traumatic stress disorder symptoms related to her rape in her childhood.  [R. at 149].  Plaintiff scored in the high end of the low average to the low end of the average range.  [R. at 150].  Plaintiff was described as appearing quite severely depressed.   [R. at 150].   Plaintiff's global assessment of functioning ("GAF") was listed as 40.  [R. at 150].  The examiner noted that it was unclear what degree of improvement would be seen in her future because she had been treated for such a short time.  [R. at 151].  Plaintiff was noted as able to understand and remember moderately complex instructions during a normal workday; able to interact in a moderate contact situation with the general public and supervisors; able to adapt to a moderately demanding work environment.  [R. at 151].  The examiner also noted that Plaintiff would "appear unable to concentrate and persist on even simple tasks during a normal work day."  [R. at 151].

Plaintiff was examined by Saad M. Al-Shathir, M.D., on January 16, 2002.  [R. at 152].  Plaintiff complained of pain in her upper limbs, and stated that sometimes her hands were numb.  [R. at 152].  Plaintiff also complained of pain in both of her legs, depression and confusion, and headaches and neck pain.  [R. at 152].  Plaintiff was 223 pounds and 65 3/4 inches tall.  [R. at 152].  Plaintiff's coordination and muscle tone was reported as normal.  Plaintiff had tenderness in the interscapular area in both of her upper limbs from the shoulder to the wrist and complained of pain with range-of-motion.  [R. at 153].  The

doctor concluded that Plaintiff had myalgias of her upper limbs from repetitive use; pain in her legs below her knees (subjectively) without loss of range-of-motion; headaches and neck pain, and intermittent depression and confusion. [R. at 153]. Plaintiff had a limited restriction in the range-of-motion of her neck and back. [R. at 154].

In September 2001 Plaintiff complained of pain and tightness in her left leg from her calf proceeding into her thigh. [R. at 166]. On October 25, 2001, Plaintiff stated she was experiencing problems with depression. [R. at 165]. On January 10, 2002, Plaintiff complained of muscle pain over her entire body and tightness in her right shoulder. [R. at 164].

A Residual Functional Capacity Assessment was completed February 19, 2002. [R. at 158]. Plaintiff's ability to remember detailed instructions, carry out detailed instructions and maintain attention for extended periods was noted as moderately limited. [R. at 158]. Plaintiff's ability to interact appropriately with the general public was noted as moderately limited. [R. at 159]. All other categories were marked as not significantly limited. [R. at 159]. Plaintiff was noted as being able to read, understand, and carry out simple instructions and some more complex instructions. Plaintiff was described as being able to adapt to a moderately demanding work environment but would have moderate difficulty dealing with the general public. [R. at 160].

A Psychiatric Review Technique form was completed by C.M. Kampschaefer, Psy.D., on February 19, 2002. [R. at 178]. Plaintiff was noted as having "major depression, chronic with psychotic factors." [R. at 181]. Plaintiff also had post-traumatic stress disorder due to a rape in her childhood. [R. at 183]. Plaintiff's restriction of daily activities was noted as mild, the difficulties in maintaining social functioning as marked,

difficulties in maintaining concentration was moderate, and repeated episodes of deterioration was noted as insufficient evidence. [R. at 188].

Shirley M. Chestnut, D.O., wrote on April 30, 2002, that Plaintiff had been her client since November 2001. She noted that Plaintiff was suffering from major depression, moderate, without psychotic features as well as generalized anxiety disorder. "However, Mary's physical problems are the primary source of her disability and in themselves, contribute to her depression and anxiety. I cannot comment on her ability or inability to maintain a steady employment status because I do not treat her physical disabilities. Mary has demonstrated a limited improvement in her emotional health with the medication regime she is currently following." [R. at 193].

Grand Lake Mental Health Center completed a "comprehensive assessment" of Plaintiff on November 12, 2001. [R. at 207]. Plaintiff was noted as working as a home health worker until 1998 when she quit her job to care for her sick daughter and ailing husband. [R. at 207]. The examiner noted that Plaintiff had been diagnosed for two years with fibromyalgia which caused Plaintiff pain. Plaintiff reported sleeping poorly at night. [R. at 207]. Plaintiff stated that she believed that the people in the cemetery were better off than she was. Plaintiff indicated she was forgetful, suffered from social phobia, and was afraid to drive. [R. at 207]. Plaintiff noted she was raped when she was 22 years old by a boyfriend, and that Plaintiff recently discovered that the same person may have raped her daughter when her daughter was five years old. [R. at 207]. The examiner noted that Plaintiff denied an alcohol or drug problem, but that Plaintiff's choice of husbands had been alcoholics or addicts. [R. at 207-08]. Plaintiff indicated that she had tried to commit suicide on two previous occasions, but denied any current suicidal thoughts. [R. at 208]. Plaintiff

was open with the examiner and made good eye contact.  [R. at 109].  Plaintiff's concentration and attention were described as fair.  [R. at 209].  Plaintiff was diagnosed with major depression, moderate, recurrent without psychotic features and generalized anxiety disorder.  [R. at 209].  Plaintiff's current GAF was noted at 45, with her highest GAF in the prior year as 52.  [R. at 209].

Physician notes from Grand Lake Mental Health Center dated December 21, 2001, indicate Plaintiff was tearful and in sad affect.  [R. at 211].  On April 2, 2002, Plaintiff was described as pleasant and appropriate with outgoing and animated conversation.  [R. at 194].  On February 2002 Plaintiff complained that she was having problems with depression.  [R. at 196].  The record contains several months of treatment notes for Plaintiff att Grand lake Mental Health Center.  [R. at 202].  In February 2003, Plaintiff reported a very stressful month due to her son-in-law going to prison.  [R. at 238].  On April 1, 2003, Plaintiff described some difficulty with depression and requested a different medication.  [R. at 234].  On April 22, 2003, Plaintiff reported problems with some depression but no suicidal ideation.  [R. at 232].  Plaintiff was described as pleasant, calm, and cooperative.  [R. at 232].

A physical Residual Functional Capacity Assessment form was completed by Paul Woodcock, M.D., on February 20, 2002.  [R. at 171-77].  The doctor indicated that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk six hours in an eight hour day, sit for six hours in an eight hour day, and push or pull an unlimited amount.  [R. at 171].  The examiner noted that Plaintiff complained of pain in her legs but had a full range-of-motion, and complained of neck pain but had a full range-of-motion of her C spine.  [R. at 171].

-- 7 --

Shirley M. Chestnut, D.O., wrote an "update" on Plaintiff on June 3, 2003.  [R. at 229].  She noted that Plaintiff was currently diagnosed with generalized anxiety disorder and major depressive disorder, recurrent moderate.  She explained that Plaintiff's disorders were manifested by tearfulness, sleeplessness, anxiety, daily fears and worries, fatigue, and passing thoughts of suicide.  She noted that Plaintiff "is relatively stable on her medication regime at this time."  She concluded that when considering Plaintiff's ongoing emotional difficulties along with her reported physical ailments, it did not appear that Plaintiff was employable.  [R. at 229].

Plaintiff testified at a hearing before an ALJ on July 9, 2003.  [R. at 281].  Plaintiff stated that she was married but that no children lived in her household.  Plaintiff was 54 years old at the time of the hearing before the ALJ and testified that she completed ninth grade but did not obtain a GED.  [R. at 287].

Plaintiff testified that she stopped working because she just could not handle the job anymore.  Plaintiff noted that her nerves caused her problems, and that she became shaky and could not accurately complete her paperwork.  [R. at 288].

According to Plaintiff, when she wakes in the morning she is very stiff.  [R. at 289].  Plaintiff indicated that she had been diagnosed with fibromyalgia.  [R. at 290].  Plaintiff also noted that she suffers from an uncontrollable bladder problem.  [R. at 290].  Plaintiff also testified that she has depression and experiences confusion and anxiety.  [R. at 292].  According to Plaintiff she rarely drives.  [R. at 292].  Plaintiff noted that she had been hearing things and her doctors placed her on Risperdal.  [R. at 293].

Plaintiff testified that she usually wakes up around 7:00 a.m.  [R. at 293].  Plaintiff stated that she makes cereal for breakfast, and that sometimes her husband makes

breakfast.  [R. at 294].  Plaintiff and her husband do dishes.  Plaintiff's husband vacuums.

Plaintiff is able to put dry clothes into the washing machine.  Plaintiff also folds clothes.  [R.

at 295].  Plaintiff stated that she attempts to work in the garden but is usually unable to

work and frequently takes a nap.  [R. at 295].  Plaintiff makes sandwiches for lunch and

simple dinners.  [R. at 297].  Plaintiff watches a few hours of television in the evening.  [R.

at 297].  Plaintiff testified that she cannot focus on reading and simply cannot comprehend

what she is reading.  [R. at 298].  Plaintiff and her husband do the grocery shopping

together.  [R. at 298].

According to Plaintiff, she drops things frequently due to her grip problem.  [R. at

301].  Plaintiff also testified that she injured her hand while working at Braums and that the

doctor told her that she would be unable to ever perform repetitive work.  [R. at 304].

According to Plaintiff, her husband is on disability and has been for three or four

years.  [R. at 294].

## II. SOCIAL SECURITY LAW AND STANDARD OF REVIEW

The Commissioner has established a five-step process for the evaluation of social

security claims.  *See* 20 C.F.R. § 404.1520.  Disability under the Social Security Act is

defined as the

> inability to engage in any substantial gainful activity by reason
> of any medically determinable physical or mental impairment
> . . . .

42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Social Security Act only if his

> physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work in the
> national economy. . . .

42 U.S.C. § 423(d)(2)(A).[3/]

The Commissioner's disability determinations are reviewed to determine (1) if the correct legal principles have been followed, and (2) if the decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

The Court, in determining whether the decision of the Commissioner is supported by substantial evidence, does not examine the issues *de novo*. *Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. *Qualls v. Apfel*, 206 F.3d 1368 (10th Cir. 2000); *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). The Court will, however, meticulously examine the entire record to determine if the Commissioner's determination is rational. *Williams*, 844 F.2d at 750; *Holloway v. Heckler*, 607 F. Supp. 71, 72 (D. Kan. 1985).

---

[3/]   Step One requires the claimant to establish that he is not engaged in substantial gainful activity (as defined at 20 C.F.R. §§ 404.1510 and 404.1572). Step Two requires that the claimant demonstrate that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 1521. If claimant is engaged in substantial gainful activity (Step One) or if claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, claimant's impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed disabled. If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that his impairment or the combination of impairments prevents him from performing his past relevant work. A claimant is not disabled if the claimant can perform his past work. If a claimant is unable to perform his previous work, the Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of his age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy. If a claimant has the RFC to perform an alternate work activity, disability benefits are denied. *See* Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

"The finding of the Secretary[4/] as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §  405(g).  Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750.  In terms of traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance.  *Perales*, 402 U.S. at 401.  Evidence is not substantial if it is overwhelmed by other evidence in the record.  *Williams*, 844 F.2d at 750.

This Court must also determine whether the Commissioner applied the correct legal standards.  *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards.  *Glass*, 43 F.3d at 1395.

### III.  ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ found that Plaintiff could physically perform the lifting and carrying requirements of light work.  The ALJ determined that Plaintiff could not perform her past relevant work.  The ALJ noted that, based upon the Grids, Plaintiff was not disabled.  In addition, the ALJ considered the testimony of a vocational expert that significant jobs existed in the national economy which Plaintiff could perform.  The ALJ determined that Plaintiff was not disabled.

---

[4/]   Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103-296.  For the purpose of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner."

## IV.  REVIEW

Plaintiff initially asserts that the ALJ's findings with regard to Plaintiff's mental capabilities is in error.  Plaintiff references the examination by Dr. Kent on January 4, 2002, and notes that Dr. Kent found that Plaintiff suffered from major depression and that Plaintiff would be unable to concentrate or perform even simple tasks during a normal work day. Plaintiff notes her GAF assessments as ranging between 40 and 52.  Plaintiff was treated at Grand Lake Mental Health Center beginning in November 2001, and through the date of her hearing in July of 2003.  Plaintiff notes that the only mental limitation which the ALJ included in Plaintiff's RFC was the ability to perform simple and repetitive work and incidental contact with the public.  Plaintiff generally asserts that the ALJ erred in rejecting the opinions of Plaintiff's treating physicians and in concluding that Plaintiff's mental impairment was not severe.

The record contains some support for Plaintiff's claim that she suffers from a mental impairment.  Several doctors have diagnosed Plaintiff with depression and generalized anxiety disorder.  Plaintiff's treating physician (for her mental limitations) suggested Plaintiff was disabled, but the physician suggested that Plaintiff's physical limitations were the cause of her disability.  The ALJ appropriately discounts the physician's conclusory statements as to Plaintiff's disability.

The Court cannot find, however, that the ALJ's findings as to Plaintiff's mental limitations are supported by substantial evidence.  Plaintiff has been diagnosed with depression and anxiety disorders.  Plaintiff has received treatment for approximately two years for her mental condition.  Plaintiff regularly visits a doctor and is prescribed medication for her disorder.  The record contains several GAF scores, all of which are 52

-- 12 --

or below.  The examining doctor, Dr. Kent, who completed an assessment of Plaintiff's ability to perform activities, wrote that Plaintiff would be unable to "concentrate and persist on even simple tasks during a normal work day."  [R. at 151].  Therefore, there is evidence in the record from an examining doctor that Plaintiff cannot perform simple work tasks. This same doctor noted that Plaintiff could remember complex instructions during a normal work day and could interact with the general public and supervisors.  Therefore, it may be that the examiner's notation that she could not perform simple tasks was a mistake. However, this remains unexplained and unchallenged in the record.[5/]  The examiner also notes that it was unclear as to what degree of improvement would be seen in Plaintiff's future because she had been treated for such a short time.  [R. at 151].  The Court concludes that the record does not contain substantial evidence to support the ALJ's conclusion that Plaintiff can perform simple tasks.

Plaintiff also noted, as support for his conclusion that Plaintiff can perform numerous activities of daily living that Plaintiff's reported activities included reading.  Although Plaintiff completed a social security form indicating that she read as much as one hour each day, at the hearing before the ALJ Plaintiff testified that she was unable to read because she could not remain focused.  On remand, the ALJ should clarify Plaintiff's reported discrepancies in the record.

Dated this <u>19th</u>  day of October 2005.

Sam A. Joyner
United States Magistrate Judge

---

[5/]   Based on the record, the Court believes that recontacting Dr. Kent may, under the circumstances of this case, be appropriate.  Based upon the other findings of Dr. Kent, it could be that the statement that Plaintiff is not able to perform simple tasks was a mistake.